**Petitioner-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.**

**No. 82-8027.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 4, 1985.

Neil H. Fink, Detroit, Mich., for petitioner-appellant.

Susan V. Boleyn, Senior Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Joseph Mulligan, a state prisoner under sentence of death, appeals the decision of the United States District Court for the Middle District of Georgia denying his petition for a writ of habeas corpus. We affirm.

## I. PROCEDURAL BACKGROUND

Joseph Mulligan was tried for two counts of murder in the Superior Court of Musco-gee County, Georgia. Trial testimony revealed that he had journeyed from South Carolina to Columbus, Georgia, in 1974 and, with the help of Timothy Helms, killed Patrick Doe and Marian Miller on April 14, 1976. On November 4, 1976, he was found guilty of both murders by the trial jury and sentenced to death.

The Georgia Supreme Court reversed Mulligan's death sentence for the murder of Doe, but affirmed the sentence imposed for Miller's death. *Mulligan v. State*, 245 Ga. 266, 264 S.E.2d 204 (1980). The Supreme Court of the United States denied his petition for writ of certiorari. *Mulligan v. Georgia*, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980). Mulligan then sought habeas corpus relief in the Georgia state courts, but was unsuccessful. A second petition for writ of certiorari was denied by the U.S. Supreme Court. *Mulligan v. Zant*, 454 U.S. 1068, 102 S.Ct. 618, 70 L.Ed.2d 603 (1981).

The instant habeas corpus action, brought pursuant to 28 U.S.C.A. § 2254, was filed on January 18, 1982. In his petition, Mulligan raised twelve separate constitutional issues.[1] The district court did not develop the record by holding an evidentiary hearing, but it did allow the parties to take depositions on the ineffective assistance of counsel claim. The petition was denied on May 17, 1982 in an order that explicitly discussed only the ineffective assistance claim.

Mulligan raises only two issues in his appeal of the district court's order. First, he argues that his trial counsel was ineffective at both the guilt and sentencing phases of his trial due to an inexcusable lack of pre-trial investigation. Second, he claims

---

* Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

1. The claims were as follows: (1) that trial counsel was ineffective; (2) that the sentencing jury had insufficient guidance and the penalty was disproportionate to the penalties rendered in similar Georgia cases; (3) that prosecutorial argument was improper; (4) that no theoretical justification exists for capital punishment; (5) that the grand jury was composed in an uncon-stitutional manner; (6) that jurors were wrongly excluded because of their anti-death penalty feelings; (7) that an in-court identification was improper; (8) that the Georgia death penalty statute is overbroad and vague; (9) that jury instructions at the sentencing phase were improper; (10) that the jury was made up in an unconstitutional fashion; (11) that the death penalty is discriminatory; and (12) that the prosecutor systematically excluded blacks from serving on juries in the jurisdiction.

that the prosecutor's closing statements were so improper that they rendered both the guilt and sentencing phases fundamentally unfair. We consider each issue below.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. *Facts*

Mr. Jay Fitt was appointed by the trial court to represent Mulligan in his capital trial. Fitt was an experienced criminal defense attorney, having served as counsel for between 75 and 100 defendants. The Mulligan case was the first case to be tried in the Columbus area under a new Georgia capital sentencing statute.[2]

When Fitt first contacted Mulligan, the appellant insisted that he had not been in Columbus on the day of the crime, but had been with his family in Beaufort, South Carolina. Fitt explained to Mulligan that a "family alibi" is not often persuasive, and would probably result in a conviction, but Mulligan was adamant. Immediately thereafter, the prosecutor, Mr. Mullins Whisnant, indicated his willingness to recommend a life sentence if Mulligan would plead guilty. Once again, Fitt explained this to his client and told him that a plea would be "a safe way to go if there was any danger at all of ... being convicted." Fitt Deposition at 15. Mulligan was adamant that he did not commit the crime and would not plead guilty.

After Mulligan rejected the plea bargain, Fitt travelled to South Carolina to interview potential alibi witnesses. He spoke with many family members and they all corroborated Mulligan's story. Fitt was convinced by their assertions and felt that he could put up a strong defense. He intended to call these family members as witnesses at trial and also planned, in the eventuality of a guilty verdict, to have them testify at the sentencing stage about Mulligan's personal character.

Fitt talked to the prosecutor about the state's witnesses, and knew that the state was going to produce several eyewitnesses to testify that Mulligan was in Columbus at the time of the murder. He asked the prosecutor to put the witnesses in touch with him, but did not make any additional effort to speak with the witnesses before trial. From his conversations with the prosecutor, Fitt knew that two captains and a lieutenant from Fort Benning would be available to testify that they saw Mulligan on the morning of April 13, 1976 helping Patrick Doe wash his Lincoln Continental, and that Mulligan had been brandishing a gun. Fitt knew that he would have to "mak[e] those people out to be either mistaken or to be liars...." Fitt Deposition at 20. In addition, he did not speak with Timothy Helms, Mulligan's accomplice who had been given immunity from prosecution and whom he knew would provide direct testimony that Mulligan shot the victims. Fitt explained this failure by claiming that Helms was not in the Columbus area before trial; however, he did not move for a continuance or otherwise demonstrate any hesitation to proceed once Helms appeared at the trial. Rather, he trusted his ability to damage Helms' credibility with the jury because of the grant of immunity. Finally, Fitt turned down an offer by the prosecutor to provide him with the government's list of witnesses, apparently believing that he already knew who the witnesses were and that his strategic choice to pursue the alibi defense did not require further investigation of the state's case.

At trial, Fitt made serious attempts in cross-examination to undermine eyewitness accounts that placed Mulligan in Columbus, Georgia. The eyewitnesses were completely certain, however, and did not equivocate during Fitt's questioning. Fitt also cross-examined Timothy Helms at length, bringing out some minor conflicts between his trial testimony and a previous written statement and exploring the effect of the

---

**2.** The Georgia statute, currently codified at Ga. Code Ann. § 17–10–30, *et seq.,* was enacted in 1973 following the decision by the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

grant of immunity upon his credibility as a witness.

The crucial moment in the trial occurred when the state called David Rice, a fingerprint expert, as its last witness. Immediately after Rice asserted that Mulligan's fingerprints had been found in the car where the victims' bodies were discovered, Fitt approached the bench and objected to the testimony because he had not been told that the witness was going to appear. In the presence of the jury, the prosecutor explained that Fitt had said he was not interested in the state's witness list. This argument continued for a short time before Fitt asked for the jury to be excused. The court then ruled that because Fitt had not made a formal demand for the state's witness list, his objection to Rice's testimony would not be sustained.

Following this colloquy, Fitt returned to counsel table. Mulligan leaned over to him and said "I didn't tell you the truth." This remark placed Fitt in an impossible position vis-a-vis the planned alibi defense. Although he had explained in his opening statement that Mulligan and his family members would testify that Mulligan was in South Carolina, he now knew that the alibi was untrue. He therefore decided not to put on any witnesses in defense. Instead, he stressed in closing argument the incredibility of Helms' testimony and suggested that he, rather than Mulligan, may have been the principal assailant.

At the sentencing stage, Fitt's original plan was to have family members testify about Mulligan's character. However, following the revelation that these family members might lie about where Mulligan was on the day of the crime (communicated to the jury's by Fitt's opening statement, which explained that they would testify in support of the alibi), Fitt concluded that testimony of family would not help Mulligan avoid a capital sentence. Instead, he decided that "we might get a lot more mileage out of ... just arguing the issue of the death penalty from an emotional point of view." Fitt Deposition at 45. Aside from Fitt's closing argument, there was no evidence introduced for the defendant at sentencing.

B. *Legal Standard*

▮▮▮▮ The Sixth Amendment guarantees to criminal defendants the right to "adequate legal assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). Claims that defense counsel's efforts fell below the standard of adequacy constitutionally required, commonly called "ineffective assistance" claims, are governed by the standards recently set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, a defendant must first show that counsel's efforts fell "outside the wide range of professionally competent assistance." *Id.* at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. This standard demands deference to choices made by the trial attorney. *Id.* at ——, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. If a defendant makes the initial showing, he must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. If both prongs of the test are met, relief will be granted.

▮▮▮▮ Concerning the analysis of attorney competence, the protections of the Sixth Amendment necessarily extend to counsel's activities before trial, when "consultation, thorough going investigation and preparation [are] vitally important." *Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1932). This circuit has held that "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper*, 575 F.2d 1147, 1149–50 (5th Cir. 1978). The evaluation of whether an attorney has adequately conducted pre-trial investigation is complex, depending upon such factors as "the number of issues in the case, the relative complexity of those issues, the strength of the government's

case, and the overall strategy of trial counsel." *Washington v. Strickland*, 693 F.2d 1243, 1251 (5th Cir. Unit B 1982) (en banc), *rev'd*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[3] Further complicating the inquiry is the need to evaluate the effectiveness of pre-trial actions from the standpoint of what was possible at the time rather than from the omniscient perspective made possible by a reviewing court's awareness of how the case was ultimately resolved. *Strickland v. Washington*, 466 U.S. at 668, 104 S.Ct. at 2065, 80 L.Ed.2d at 694 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight ...."). *See Washington v. Watkins*, 655 F.2d 1346, 1356 (5th Cir. Unit A September 14, 1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). With these general principles in mind, we now examine Mulligan's particular claim.

### C. *Analysis*

This case presents an unusual situation in the continually evolving body of case law defining effective assistance of counsel. Unlike other cases concerning the adequacy of pre-trial investigation, Fitt's assistance does not involve a complete lack of preparation. *See, e.g., Kemp v. Leggett*, 635 F.2d 453 (5th Cir. Unit B Jan. 27, 1981) (counsel performed no pre-trial investigation); *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir.1978) (counsel failed to interview any witnesses). Fitt was appointed at least two months before trial. He had numerous contacts with his client, discussed the case frequently with the prosecutor, presented an opportunity for his client to plead guilty and receive a life sentence, investigated an alibi defense, and prepared witnesses for trial and sentencing testimony. Nor does this case involve the occasional situation in which an attorney explicitly disregards the client's stated defense to the criminal charge. *See Gomez v. Beto*, 462 F.2d 596

(5th Cir.1972) (client notified attorney of alibi witnesses, but attorney refused to interview them or present alibi defense at trial). In this case, Fitt made significant efforts to shake Mulligan's reliance on the alibi defense, but the persistence of his client and the persuasiveness of the family members' proposed testimony ultimately convinced him of the validity of the defense. Thus, the strategy was to present the alibi defense which Mulligan had conveyed to Fitt. The question raised in this case is whether Fitt's failure to formally request a witness list or interview those state witnesses he did know about—actions which would have revealed the strength of eyewitness testimony as well as testimony of a fingerprint expert placing the defendant at the murder scene—constituted ineffective assistance of counsel in light of Mulligan's misrepresentations and the other circumstances of the case.

■■■ 1. *Choice to Pursue the Alibi Defense:* At the start, we note that a defendant's Sixth Amendment rights are his alone, and that trial counsel, while held to a standard of "reasonable effectiveness," is still only an *assistant* to the defendant and not the master of the defense. *See Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Our criminal system allows a defendant the choice of whether he wants to be represented by counsel at trial. *See generally Faretta.* Because we recognize that a defendant must have this broad power to dictate the manner in which he is tried, it follows that, in evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client. The Court in *Strickland v. Washington* said:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are

---

**3.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34. *Cf. Bonner v. City of Prichard,* 661

F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. *See United States v. Decoster,* 624 F.2d [196], at 209–10 [D.C.Cir.1976].

466 U.S. at ——, 104 S.Ct. at 2066–67, 80 L.Ed.2d at 695–96. This is not to say that an attorney has no professional independence to act without the explicit permission of his client. Rather, if he is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not be lightly disturbed.[4]

█ In this case, Mulligan insisted from the start that he was not guilty of the murders. Fitt informed him that a "family alibi" defense was weak and that it would likely result in a conviction. Fitt strongly advised him to accept the plea bargain "if there is any chance" of being convicted. Mulligan knew that the state would present eyewitnesses placing him in Georgia and that Helms would testify against him. Still, he held on to his alibi and insisted

upon his innocence. Fitt was not required to pressure Mulligan any further. In light of the foregoing and the apparent persuasiveness of the witnesses who said they would corroborate Mulligan's alibi, the choice to proceed with the alibi defense was a reasonable one. *See Dixon v. Balkcom,* 614 F.2d 1067, 1068 (5th Cir.1980) ("While constitutionally effective counsel must make an informed evaluation of possible defenses and have a meaningful discussion of the reality of the case with his client, in light of [the client's] directions these requirements were met").

2. *Investigation of the Alibi Defense:* Even though we accept Fitt's strategic choice of the "family alibi" defense, we must still determine whether, having chosen it, he conducted a reasonable investigation of that defense. *Strickland v. Washington,* 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Such an investigation has been held to include " 'an independent examination of the facts, circumstances, pleadings and laws involved.' " *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979), *quoting Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948).

The extent of Fitt's investigation is clear from the record. He consulted with Mulligan, talked to the prosecutor, and interviewed and prepared defense witnesses. He did not attempt to interview the state witnesses of whom he was aware, although from his discussions with the prosecutor, he assumed that he knew the substance of their testimony. His assumption was correct, except for the unknown fingerprint witness. Fitt also declined the proffer of a state witness list under the mistaken belief that he already knew about all of the state witnesses.

█ Through conversations with the prosecutor, Fitt was aware that eyewitnesses would place Mulligan in Colum-

---

**4.** This principal is consistent with practical considerations in addition to the notion of defendant control embodied in the Sixth Amendment. An attorney representing a criminal defendant normally has other cases occupying his time. As a matter of efficiency, he should be able to rely upon his client's unequivocal statements in planning a defense.

bus, Georgia on the day of the crime. Fitt knew he would have to discredit these eye-witness accounts, and he attempted to do so at trial by emphasizing the possibility that their memories had faded in the two-year delay before trial. He also was aware that Helms would testify under a grant of immunity, so he prepared cross-examination to demonstrate that Helms' story was self-serving and suspicious. This cross-examination, while unsuccessful, was not insubstantial. Although it would have been wiser to interview each of the state's eyewitnesses and Helms, we cannot conclude on this record that his conversations with the prosecutor and his prepared cross-examination falls below the "reasonable substantial investigation" standard. *Strickland v. Washington*, 466 U.S. at ——, 104 S.Ct. at 2061, 80 L.Ed.2d at 689.

 The refusal of the state's witness list and the consequent failure to know about the fingerprint testimony are more troubling. But even this evidence was within the scope of the state's case as Fitt had come to understand it. He knew there would be strong evidence adduced that Mulligan was in Columbus, and he planned to attack that evidence. While the fingerprint evidence was a surprise at trial, its additional effect on an already strong state case was not overwhelming. Fitt was able to cross-examine Officer Rice and he argued to the jury that the print was unclear. While formally requesting the list would have been the better practice, we note two additional factors which serve to explain Fitt's action in not requesting the state's witness list. First, Fitt had a reasonable understanding that his conversations with the prosecutor had revealed all material witnesses. Second, in light of the alibi asserted so vehemently by Mulligan, which was corroborated by Mulligan's rejection of the plea bargain and by the convincing support from the several witnesses interviewed in Beaufort, we cannot conclude that Fitt was unreasonable in believing the alibi; thus, his complacency in not anticipating a fingerprint witness was not unreasonable.

We conclude, therefore, that Fitt's pretrial investigation was not ineffective. He thoroughly investigated the South Carolina witnesses and became aware of the boundaries of the state's case. After his attempts to shake his client's uncontroverted reliance on the alibi were rebuffed, his failure to explore further the particulars of the state's evidence did not violate Mulligan's Sixth Amendment rights under the circumstances of this case.

 This conclusion is consistent with other cases from this circuit. In *Kemp v. Leggett*, 635 F.2d 453 (5th Cir. Unit B Jan. 27, 1981), an inexperienced trial counsel was found ineffective because he turned down a possible plea bargain agreement without discussing it with his client, failed to conduct a pretrial investigation, and refused to call witnesses that the defendant had requested. In this case, on the other hand, Fitt, an experienced criminal defense attorney, made substantial efforts to persuade Mulligan to accept a guilty plea, did conduct a pretrial investigation, and attempted to put on the defense requested by his client. In *Gomez v. Beto*, 462 F.2d 596 (5th Cir.1972), trial counsel was held ineffective because he, unlike Fitt, explicitly refused to follow his client's instructions in preparing his defense. In *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir.1978), counsel was held ineffective for presenting an incredible alibi he had not even investigated when his client's own statements strongly suggested a possibly exculpatory defense that could have been corroborated by witnesses readily available for purposes of investigation. By blindly persisting with an incredible alibi that he had not attempted to either challenge or corroborate, trial counsel deprived his client of a clearly favorable defense at trial. In this case, Fitt did what he could to convince his client of the weakness of the "family alibi" and, when such a tactic did not work, he sought corroboration, which he found to be very believable. He did not overlook any evidence favorable to his client. Our conclusion that Fitt's pretrial investigation was

not ineffective is supported by the foregoing cases.[5]

 3. *Failure to Present Evidence at Sentencing Stage:* Fitt presented no evidence at the sentencing phase of Mulligan's trial, relying instead on an emotional appeal against the death penalty in his closing argument. Mulligan claims that this lack of evidence stemmed from an insufficient pre-trial investigation, *i.e.,* that Fitt put on no evidence at sentencing because he had not prepared to do so. This claim is incorrect.

Fitt planned to use the same family members at the sentencing phase who were going to corroborate Mulligan's alibi. While Mulligan now claims that other witnesses were available, he does not dispute that these family members were appropriate people to give sentencing testimony. Nor does he claim that particular substantive areas of mitigating evidence were overlooked in focusing on these family members.[6]

Following the admission by Mulligan that he had lied, Fitt began to evaluate the effect of this fairly obvious attempt at perjury on his sentencing phase presentation. He worried that the indication that Mulligan's family would lie for their son (communicated in the opening statement) would damage their credibility before the jury.

He then made a strategic choice not to put the family members on at sentencing. This choice, although certainly a very difficult one in the context of the trial, was deemed to be a reasonable strategic choice by the court below. That finding is not clearly erroneous. *See Washington v. Strickland,* 693 F.2d at 1256 n. 23.

### D. *Conclusion*

For the foregoing reasons, we conclude that Fitt's representation did not fall below the reasonably effective level required by the Sixth and Fourteenth Amendments.

### III. PROSECUTORIAL ARGUMENT

 Mulligan's claim that the guilt phase of his trial was rendered fundamentally unfair by the prosecutor's closing argument warrants little discussion. The asserted infractions in the prosecutor's argument were either not improper at all or relatively nonprejudicial. In light of the foregoing and the overwhelming evidence of guilt, we have no difficulty concluding that there is no merit to Mulligan's challenge to the prosecutor's argument in the guilt phase.

Mulligan also asserts that the prosecutor's closing argument in the sentencing phase was so improper as to render his sentencing proceedings fundamentally un-

**5.** Even if we were to assume that Fitt's failure to interview the known witnesses and his failure to obtain the complete state witness list did fall below the standard of effective assistance of counsel, Mulligan would clearly fail to satisfy the prejudice prong of his Sixth Amendment claim. As noted above, the prejudice prong requires Mulligan to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, ——, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984). Fitt's failure to interview the state's eyewitnesses caused no prejudice, because Fitt did learn the substance of their testimony from his conversations with the prosecutor. Fitt's failure to obtain the complete state witness list, and thus not know of the fingerprint witness, was also not prejudicial. Mulligan's initial defense strategy was rendered ineffectual not by the failure to obtain the witness list, but rather because Mulligan himself finally admitted to his attorney that he was in

fact in Columbus on the crucial day, thus making it impossible for Fitt to present the alibi defense. Fitt's mistake in failing to obtain the complete list pales in significance compared to Mulligan's own affirmative misrepresentations to his attorney. We thus conclude that any prejudice to Mulligan's case was caused by his own lie, and not by Fitt's mistake.

**6.** Fitt had prepared the family members to testify about Mulligan and their concern for him. Petitioner submitted a list of twenty-five witnesses in his state habeas corpus proceeding, most of whom Fitt had never contacted. Significant, however, is the fact that the affidavits of these twenty-five do not contain allegations going beyond the general good character of Mulligan. Thus, it is not clear that the presentation of any of these uncontacted witnesses would have added anything but cumulative testimony to the case in mitigation that had already been prepared by Fitt.

fair. The prosecutor in the instant case also prosecuted *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.1985) (en banc). The challenged argument here is so similar to the argument in *Brooks* that we conclude that the severity of the several improper aspects of the argument is almost identical to that in *Brooks*. Although a prosecutorial misconduct challenge requires a fact sensitive inquiry, and for that reason prior cases will very seldom be squarely in point, we conclude that this case is controlled by *Brooks*. Accordingly, without need for further discussion, we reject Mulligan's claim for relief based on the prosecutor's argument in the sentencing phase.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.