**Charles Kenneth FOSTER,**
**Petitioner-Appellant,**

**v.**

**Richard L. DUGGER, and Robert A.**
**Butterworth, Attorney General,**
**Respondents-Appellees.**

**No. 86–3539.**

United States Court of Appeals,
Eleventh Circuit.

July 16, 1987.
Rehearing and Rehearing En Banc
Denied Sept. 3, 1987.

---

two women then divided the money in Lanier's wallet.

The trial began on October 1, 1975. Foster's case rested entirely on his own testimony. Foster was planning to suggest that one of the women committed the homicide. In the middle of this testimony, however, Foster broke down and made a dramatic witness stand confession consistent with his earlier confession to the police. Following this confession, the jury convicted Foster of murder in the first degree and robbery. The sentencing phase commenced immediately thereafter.[1]

During the penalty phase, Mayo pursued a strategy Foster had earlier rejected: to defend on the basis of Foster's mental and emotional state at the time of the crime. The mitigating evidence Mayo presented to the jury consisted entirely of the testimony of two witnesses and documents pertaining to Foster's two involuntary commitment proceedings.[2]

First, Foster's ex-wife described the "abnormalities in [Foster's] behavior:"

> Well, he cut himself all the time and he has cut all the arteries in his arms and he has cut the heel strain in two and he has burnt steel wool in his leg. Just all kinds of things. The only reasons he doesn't kill hisself [sic] is because he thinks that that is the one crime that he cannot be forgiven for.

Mrs. Foster concluded with an impassioned plea not to kill her ex-husband because he was "a very sick person."

Dr. John Mason, a psychiatrist who had treated Foster, testified next. The doctor's testimony was limited to his assessment of the possible effect of alcohol on Foster's capacity for premeditation:

> Certainly, I would feel that from past experience Mr. Foster has very poor control when intoxicated and certainly intoxication would effect [sic] his ability to maintain a thought or to maintain a plan or carry it through. But as to estimate

Richard L. Jorandby, Public Defender, W. Palm Beach, Fla., Craig S. Barnard, Chief Asst. Public Defender, Richard H. Burr, III, N.A.A.C.P. Legal Defense Fund, New York City, Steven L. Seliger, Quincy, Fla., for petitioner-appellant.

Robert A. Butterworth, Atty. Gen., Mark C. Menser, Asst. Atty. Gen., Tallahassee, Fla., respondents-appellees.

Before GODBOLD, VANCE and JOHNSON, Circuit Judges.

VANCE, Circuit Judge:

Charles Kenneth Foster was sentenced to death after he confessed during the guilt/innocence phase of his first-degree murder trial. This is an appeal from the district court's denial of his second and successive petition for a writ of habeas corpus. Like its predecessor, Foster's second petition seeks relief based upon the performance of his attorney, Virgil Mayo. Foster again argues that judge and jury did not have the opportunity to review crucial evidence. We affirm.

## I. BACKGROUND

Foster met Julian Lanier at a bar on the evening of July 14, 1975. The two men persuaded two prostitutes to travel in Lanier's motorhome to a remote wooded area. Both men grew increasingly intoxicated. In the early morning hours of July 15, as Lanier and one of the women were about to engage in sexual intercourse, Foster attacked him and slit his throat with a knife. Aided by the women, Foster dragged Lanier into the woods and covered him with leaves and branches. Lanier, however, was still breathing. With one slice, Foster severed his spinal cord. Foster and the

---

1. Mayo promptly moved for a continuance and additional psychiatric examinations. This motion was denied.

2. The only evidence adduced by the state in the sentencing trial consisted of additional photographs of the victim's wounds.

exactly how long he would be able to do so I don't think I could really do that. Dr. Mason also identified the documents from the involuntary commitment proceedings and read his diagnosis on each occasion: "paranoid reaction" on November 25, 1970, and "suicidal depression with overdose of medication and self mutilative [sic] behavior" on February 21, 1974.[3]

At the conclusion of the sentencing hearing, the judge, but not the jury, considered reports from Dr. Mason and two other court-appointed psychiatrists.[4] These reports alluded to a long and stormy history of mental illness. All three psychiatrists concluded, however, that Foster was competent to stand trial and legally sane at the time of the crime. In accordance with the jury's recommendation, the judge sentenced Foster to death on the murder charge and life imprisonment on the robbery charge.[5]

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first petition for federal habeas corpus, Foster claimed that the jury did not have the opportunity to learn the full impact of his mental illness. Foster specifically argued that his attorney failed to extract important clinical information from his expert witness, Dr. Mason. *See Foster v. Strickland*, 707 F.2d 1339, 1344 (11th Cir.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984).[6] In fact, counsel had made a strategic decision informed by years of criminal practice in the region. Counsel felt that the jury would be more likely to respond to an emotional appeal from Mrs. Foster than to a medical discourse from Dr. Mason. We concluded

that counsel had adequately mustered the medical evidence to effectuate this strategy. *Id.* Mayo elicited from Dr. Mason enough clinical information to lend credibility to Mrs. Foster's plea that her husband was "a very sick person." Mayo also used Dr. Mason to introduce documentary proof of Foster's history of mental illness. *Id.* This tactic gave the jury a written exhibit so they did not have to remember technical oral testimony. *Foster v. State*, 400 So.2d 1, 4 (Fla.1981). It is difficult to see how counsel could have better utilized an expert witness who, along with two other psychiatrists, had already gone on record with his conclusion that the defendant was sane at the time of the homicide.

The present petition is Foster's second before the federal courts. The magistrate found and the district court specifically agreed, however, that Foster's petition was not an abuse of the writ. *See* Rule 9(b), 28 U.S.C. foll. § 2254. This finding is not challenged on appeal, and we shall not address the issue.

In the present petition Foster repeats his attack on counsel's decision to forego a detailed presentation of medical evidence and to rely instead upon Mrs. Foster's emotional plea. Although we accord such strategic decisions a heavy measure of deference, the Supreme Court has suggested an exception:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments sup-

---

**3.** The documents themselves, which were admitted into evidence, contained somewhat more detail. For example, the paperwork resulting from the 1970 commitment shows that Foster was deemed to be "incompetent by reason of paranoid reaction; ... that his incompetency is acute.... [and] chronic ... [and] that his propensities are delusional thinking...." The documents resulting from the 1974 commitment describe "drug abuse" and "hostile, combative behavior."

**4.** The three psychiatrists had examined Foster at the court's request.

**5.** The procedural history of this case through the resolution of Foster's first petition for federal habeas corpus is set forth in *Foster v. Strickland*, 707 F.2d 1339 (11th Cir.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984). *See also Foster v. State*, 400 So.2d 1 (Fla.1981); *Foster v. State*, 369 So.2d 928 (Fla. 1979).

**6.** Foster noted numerous deficiencies in his counsel's performance throughout the trial. *See Foster v. Strickland*, 707 F.2d at 1342–44.

port the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).[7] Foster now seizes upon this exception.

For purposes of this appeal, Foster argues that we should not defer to Mayo's strategic judgment because the attorney breached his duty to investigate the defendant's history of mental illness. Accordingly, our threshold inquiry is whether Virgil Mayo conducted a reasonable investigation into Foster's psychiatric difficulties.

Mayo assumed responsibility for Foster's case approximately a month before trial. He interviewed Foster on at least ten separate occasions and discussed Foster's history of mental illness during a number of these interviews. Mayo spoke to Foster's mother and ex-wife. In addition, Mayo interviewed various members of the community who were familiar with Foster. After he learned of Foster's mental disturbance, Mayo reviewed the court records of the two involuntary commitments. Mayo then discussed Foster's condition with a judge who had handled the proceedings and a psychiatrist who treated Foster.[8] Finally, Mayo reviewed the reports of the three court-appointed psychiatrists.

Foster criticizes Mayo for not pursuing two additional sources of evidence. First, Mayo did not review Foster's medical records. Second, except for a brief conversation with Dr. Mason immediately preceding his testimony, Mayo did not talk to the three court-appointed psychiatrists.

■ When assessing a decision not to investigate, we must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065. Counsel need not "pursue every path until it bears fruit or until all available hope withers." *Solomon v. Kemp,* 735 F.2d 395, 402 (11th Cir.1984), (quoting *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir.1980)), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952; *see also Washington v. Watkins,* 655 F.2d 1346, 1356 (11th Cir. Unit A 1981) cert. denied, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474. The appropriate legal standard is not error-free representation, but "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066; *see also Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2475, 91 L.Ed.2d 144 (1986).[9] Accordingly, it is necessary to review those factors that influenced Mayo's decision to forego further investigation into Foster's mental illness.[10]

---

7. The Supreme Court has articulated a two-prong test for determining whether a litigant has been denied effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. Second, the defendant must show that there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. at 2064, 2068. We conclude that Foster does not meet the requirements of the first prong of the test, and therefore we do not reach the second prong.

8. Mayo was familiar with this psychiatrist, Dr. Dunlan Wilensky, because Mayo had used Wilensky's testimony to obtain a "mercy verdict" for another client.

9. Of course, "[the adversarial] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). Such an investigation includes at a minimum an independent examination of the relevant facts, circumstances, pleadings and laws. *Mulligan v. Kemp,* 771 F.2d 1436, 1442 (11th Cir.1985) (quoting *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir.1979)); *see also Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985).

10. Foster propounds a very different test based upon "a comparison between the mitigating evidence defense counsel presented with the mental mitigating evidence he did not present due to his failure to investigate." From Foster's point of view, this test has much to recommend itself.

What counsel's investigation had revealed up until this time was a history of bizarre, self-destructive behavior intertwined with episodes of drug and alcohol abuse. A full medical account of Foster's emotional disturbance would certainly bring out these less sympathetic aspects of Foster's character. *See, e.g., Magwood v. Smith,* 791 F.2d 1438, 1445 (11th Cir.1986) (deferring under similar circumstances to counsel's decision not to present detailed medical evidence).[11] Detailed medical evidence could do more harm than good by opening the door to harmful cross-examination or rebuttal.[12] At the same time, such evidence would be of little persuasive value. From statistical studies and his own personal experience, counsel knew that psychiatric testimony would "not [be] very popular" with a Bay County jury. *Cf. Songer v. Wainwright,* 733 F.2d 788, 791 (11th Cir.1984) (counsel could conclude from experience that evidence of drug use would result in jury prejudice), *cert. denied,* 469 U.S. 1133, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985).[13]

In addition the three court-appointed psychiatrists had unanimously agreed that Foster was sane at the time of the homicide. Two of these doctors, Dr. Mason and Dr. Sapoznikoff, had been the psychiatrists most intimately involved in Foster's treatment.[14] Counsel had little reason to doubt that the conclusion of Foster's own psychiatrists would remain the bottom line. *See Foster v. Strickland,* 707 F.2d at 1343. Even if counsel were to uncover expert testimony contradicting these psychiatrist's conclusions, the introduction of this material might damage the defense's credibility and alienate the jury.[15] "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Cape v. Francis,* 741 F.2d 1287, 1301 (11th Cir.1984), *cert. denied,* 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 245 (1985); *see, e.g., Boykins v. Wainwright,* 737 F.2d 1539, 1543 (11th Cir.1984) (counsel's failure to adduce additional testimony concerning defendant's sanity did not cause

The medical records from Florida State Hospital, for example, show that four doctors opposed Foster's release because they foresaw a poor prognosis. In sum, these medical records document a pattern of psychotic behavior and delusional thinking which led a lower court to conclude that "insanity defense, effectively presented during the guilt phase, may have had an excellent chance of success."

Unfortunately, Foster's approach is erroneous because it adopts "the omniscient perspective" of hindsight, rather than counsel's perspective at the time of the challenged actions. *See Mulligan v. Kemp,* 771 F.2d 1436, 1441 (11th Cir. 1985) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052).

**11.** *See also McCleskey v. Kemp,* 753 F.2d 877, 900 (11th Cir.1985) (failure to subpoena robbery victims was reasonable where attorney feared undermining alibi defense), *aff'd,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Adams v. Wainwright,* 709 F.2d 1443, 1446 (11th Cir.1983) (where raising defendant's background "might do more harm than good," failure to present such evidence was reasonable), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).

**12.** Character evidence poses similar difficulties. When confronted with an analogous situation, courts generally defer to the strategic judgment of counsel. *See, e.g., Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986); *Adams v. Wainwright,* 709 F.2d at 1446;

*Stanley v. Zant,* 697 F.2d 955, 965 (11th Cir. 1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984); *Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir.1980).

**13.** Counsel gave the following testimony before the lower court:

Although, in Kenny's case, I was afraid of some very damaging, or aspects with a lay jury and as, as you know, the actual insanity defense as such is not very popular with the jurors especially as I found in this area and in the State of Florida from the statistics I see, but it was a back door sort of insanity defense in which I was hoping to use that phrase of the charging and judging of events and the depraved mind in the case. It really prosecuted for second degree murder myself. [sic].

In fact, Mayo truncated Dr. Mason's testimony at trial because he saw that the jury "wasn't buying."

**14.** Foster points this out in his brief. It was Dr. Mason and Dr. Sapoznikoff who supplied most of the medical information in the commitment papers.

**15.** *Cf. Mulligan v. Kemp,* 771 F.2d 1436, 1444 (11th Cir.1985) (reasonable not to put on character witnesses who, as jury learned from guilt/innocence phase, were willing to perjure themselves).

a "breakdown in the adversary process," even though such evidence would have been "helpful" to his client), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

Foster nevertheless argues that, even if there was to be no insanity defense, counsel should have searched for additional evidence that would have supported mitigation of the death penalty.[16] According to Foster, the medical records and the psychiatrists were likely sources of this material. To be sure, Foster had accumulated a potpourri of diagnoses, and his records were well stocked with the observations and reflections of his psychiatrists. Mayo, however, had before him the opinions of three experts, two of whom had been intimately involved in Foster's treatment. Mayo had little reason to believe that medical records and interviews with the psychiatrists would provide information that would materially add to the general information before him concerning Foster's illness. At this point Mayo was sufficiently well-informed to reach his conclusion that the introduction of expert testimony and medical evidence could accomplish little that would not be achieved far more effectively through the testimony of Foster's ex-wife.[17] Counsel had no cause to suspect that additional medical evidence would lead him to reassess his conclusion. Under these circumstances, counsel's decision not to pursue

---

16. We assume *arguendo* that his duty remained unaltered. In fact, there are circumstances in this case that may have operated to narrow this duty. Throughout his relationship with Mayo, Foster took an extremely unrealistic view of his options and proved an inordinately uncooperative client. Foster instructed his attorney not to raise the issue of insanity during the guilt/innocence phase, although it is not clear whether these instructions also included the sentencing proceedings. Specifically, Foster told his lawyer he desired a "walk or burn" defense.

On one hand, it is clear that a defendant's instructions may limit the scope of counsel's duty to investigate a particular defense or strategy. *See Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir.1986); *Mitchell v. Kemp,* 762 F.2d 886, 889–90 (11th Cir.1985); *Grey v. Lucas,* 677 F.2d 1086, 1094 (5th Cir.1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1985); *cf. Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066. On the other hand, it is equally clear that lawyers may not follow such commands blindly. Although the defendant retains the right to control his defense at trial, counsel must first advise his client which strategies offer the best chance of success. *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987); *Mulligan v. Kemp,* 771 F.2d 1436, 1442 (11th Cir.1985).

Uncounseled jailhouse bravado should not deprive a defendant of his right to counsel's better-informed advice. *Thompson v. Wainwright,* 787 F.2d at 1451 (quoting *Martin v. Maggio,* 711 F.2d 1273, 1280 (5th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 447, 83 L.Ed.2d 373 (1984)). This principle especially holds true where a possible mental impairment prevents the client from exercising proper judgment, *id.* at 1451 (citing Model Code of Professional Responsibility EC–7–12 (Fla. Stat. Ann. 1983)), or where an attorney foregoes a defendant's only plausible line of defense, *cf. Washington v. Strickland,* 693 F.2d 1243, 1252 (5th Cir. Unit B 1982) (en banc), *rev'd on other grounds,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

We do not need to determine the boundaries of counsel's duty in the present case because we hold that counsel's investigation would have been adequate even had there been no limiting circumstances.

17. On direct, Mrs. Foster told of her ex-husband's irrationality, self-mutilation, and suicidal urges. On cross-examination, she made the following plea:

> He is a very sick person and I have begged for help for him and so has his mother and we could not get any help from nobody. They would rather put him in the electric chair and kill him than send him to an institution where he can get help. He has been to the mental health unit on a whole lot of occasions and they let him out and they give him pills to calm his nerves and the judge won't do anything. He promised that he would. I have talked to Dr. Mason and he promised he would and I talked to Dr. Cluxton and he promised he would. And everybody at the Bay County Sheriff's Department knows me and any time I have ever had any occasion to talk to any of them, asking them to do something for him and nobody will. And they still won't because it's much easier to just go ahead and electrocute him and get it over with so they don't have to worry about somebody whose mind is bad. If he had T.B. or anything they would put in an institution and they would help him where he couldn't hurt anybody but just because his mind is bad people don't understand that. They think it's all right just to go ahead and get him out society. But why don't they get him out of society before a crime like this had to be committed.

*Foster v. Strickland,* 517 F.Supp. 597, 603–04 (N.D.Fla.1981), *aff'd* 707 F.2d 1339 (11th Cir. 1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984).

additional medical evidence was supported by "reasonable professional judgment" and counsel's decision to rely on lay testimony and to avoid the excessive use of medical evidence was a "reasonable decision that [made] particular investigations [into medical evidence] unnecessary." *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066.[18] As such, counsel had no need to further familiarize himself with the clinical niceties of Foster's illness. *See, e.g., Burger v. Kemp,* 753 F.2d 930, 937 (11th Cir.) (reasonable to terminate investigation into defendant's background where counsel made strategic decision to avoid emphasizing character evidence), *vacated on other grounds,* 474 U.S. 806, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985), *on remand,* 785 F.2d 890 (11th Cir.), *cert. granted,* — U.S. —, 107 S.Ct. 397, 93 L.Ed.2d 351 (1986).[19]

 After careful review of the record, we conclude that counsel formulated his trial strategy only after frequent consultations with his client and an informed evaluation of all his options. *See Mulligan v. Kemp,* 771 F.2d 1436, 1440 (11th Cir.1985); *Washington v. Watkins,* 655 F.2d at 1355. Foster's second habeas petition is but a thinly disguised rehash of his previous attack on this strategy. Our holding remains unchanged: we will not lightly second-guess the considered judgments of competent counsel. *Ford v. Strickland,* 696 F.2d 804, 820 (11th Cir.), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983); *Williams v. Maggio,* 679 F.2d 381, 392 (5th Cir. Unit A 1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).

AFFIRMED.

**18.** The present case should be compared to those decisions where we concluded that counsel's performance was deficient because of a failure to investigate. *See, e.g., Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 2588–89, 91 L.Ed.2d 305 (1986) (failure to request discovery based on mistaken belief state obliged to hand over evidence); *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir.1986) (failure to interview potential alibi witnesses); *Thomas v. Kemp,* 796 F.2d 1322, 1324 (11th Cir.) (little effort to obtain mitigating evidence), *cert. denied,* — U.S. —, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986); *Aldrich v. Wainwright,* 777 F.2d 630, 633 (11th Cir.1985) (failure to depose any of the state's witnesses), *cert. denied,* — U.S. —, 107 S.Ct. 324, 93 L.Ed.2d 297 (1986); *King v. Strickland,* 748 F.2d 1462, 1464 (11th Cir.1984) (failure to present additional character witnesses was not the result of a strategic decision made after reasonable investigation), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985); *Gaines v. Hopper,* 575 F.2d 1147 (5th Cir.1978) (defense counsel presented no defense and failed to investigate evidence of provocation); *Gomez v. Beto,* 462 F.2d 596 (5th Cir.1972) (refusal to interview alibi witnesses); *see also Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir.1985) (counsel did not pursue a strategy, but "simply failed to make the effort to investigate").

**19.** *See also Songer v. Wainwright,* 733 F.2d 788, 791 (11th Cir.1984) (further investigation of drug abuse unnecessary where counsel had concluded that such evidence would be harmful), *cert. denied,* 469 U.S. 1133, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985); *cf. Mulligan v. Kemp,* 771 F.2d 1436, 1443 (11th Cir.1985) (failure to request state's witness list not ineffective where counsel already aware of "boundaries of the state's case").