William Howard PUTMAN, Petitioner,

v.

Tony TURPIN, Warden, Georgia Diagnostic & Classification Prison, Respondent.

No. Civ.A. 7:97–CV–31(HL).

United States District Court, M.D. Georgia, Macon Division.

June 9, 1999.

Marcia G. Shein, Atlanta, GA, Stephen C. Bayliss, Atlanta, GA, for William Howard Putman, petitioner.

Paula K. Smith, Atlanta, GA, for Tony Turpin, respondent.

## ORDER

LAWSON, District Judge.

William Howard Putman has petitioned this Court for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Petition is hereby **DENIED.**

## I. Procedural History

From September 13–17, 1982, Petitioner William Howard Putman was tried before a jury for the malice murders of David Hardin and his wife, Katie Christine Back. He was found guilty and sentenced to death for each murder. The murder convictions and death sentences were confirmed on direct appeal. *Putman v. State,* 251 Ga. 605, 308 S.E.2d 145 (1983). Petitioner filed a petition for a writ of habeas corpus and a motion for stay of execution in the Superior Court of Butts County on September 18, 1984. The court found that the nine claims raised lacked merit and denied Petitioner's motion for a stay of execution. *Putman v. Kemp,* No. 84–v–6518 (Butts Sup.Ct. September 18, 1984).

Without appealing to the Supreme Court of Georgia, Petitioner then filed a federal habeas petition and a motion for stay of execution in this Court on September 19, 1984. *Putman v. Kemp,* Civil Action No. 84–79 (M.D.Ga. Dec. 4, 1984). This Court granted a stay of execution on September 19, 1984. However, the case was voluntarily dismissed on December 4, 1984, for lack of exhaustion because of the pendency of the Butts County case.

During the pendency of the federal petition, Petitioner's new counsel filed on October 18, 1984, a motion for new trial or, in the alternative, to set aside judgment in order to reopen the evidence in the state habeas corpus case. The state habeas court denied this motion the following day. Counsel also filed an amendment to the Butts County petition in which he raised a claim for ineffective assistance of trial counsel. In addition, he filed a notice of appeal from the denial of habeas relief by the state habeas court one month before, as well as an application for a certificate of probable cause to appeal. The application was granted by the Supreme Court of Georgia on November 19, 1984, and the case remanded for an evidentiary hearing on the issue of trial counsel's alleged ineffectiveness.

A full evidentiary hearing was held on August 27, 1985. The state habeas court subsequently found no merit to either the ineffective assistance claim or any of the other issues raised in Petitioner's two amendments to the original petition. On July 12, 1989, the Georgia Supreme Court denied the application for a certificate of probable cause to appeal. The United States Supreme Court subsequently denied certiorari. *Putman v. Zant,* 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).

In June 1992, Petitioner filed a second petition for writ of habeas corpus in the Superior Court of Butts County. *Putman v. Zant,* No. 92–v–319 (Butts Sup.Ct. filed June 12, 1992). On September 23, 1993, the state habeas court found that grounds II through XIV of the petition were successive and dismissed them on that basis. The Court declined to dismiss as succes-

sive ground I, which alleged six violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After a hearing on the issue, the Court denied relief as to the *Brady* claims, finding that one was successive and the remaining five lacked merit. The Supreme Court of Georgia denied the application for certificate of probable cause to appeal on January 18, 1995, and denied the motion for reconsideration on April 20, 1995. The United States Supreme Court denied certiorari on December 4, 1995, and denied rehearing on January 22, 1996. Petitioner has now filed the instant petition for federal habeas corpus relief.

## II. Facts of the Case

On direct appeal, the Supreme Court of Georgia made the following findings of fact in this case:

In the early morning hours of July 10, 1980, David Hardin and his wife Katie, residents of Kentucky, were shot to death at an Interstate 75 rest area near Lenox, Georgia. Truck driver William Howard Putman was arrested and charged with two counts of murder. The victims spent the week preceding their deaths vacationing in Daytona Beach with their three children and David's niece Beverly Culver. They left Daytona Beach in their blue Dodge sedan on the evening of July 9 and arrived at the Lenox rest area some time prior to 3:00 a.m. on the tenth. They parked in the automobile parking lot of the rest area and went to sleep.

Later arrivals at the rest area included Verlin Colter, who parked two spaces to the right of the Hardins, and Dessie Harris, who parked across the drivethrough, opposite the Hardin automobile. Dessie testified that, upon her arrival, she spread a blanket on the hood of her car. As she sat on the blanket, smoking a cigarette, she observed a darkcolored "semi," pulling a flat-bed trailer, drive slowly several times through the automobile parking lot. The truck eventual-

ly parked at the end of the parking lot. The driver got out, reached into the cab of the truck, retrieved an object and walked toward her car. He stopped under a nearby tree, approximately five feet from Dessie, and whistled at her. She stared at him but said nothing. The man then walked behind her car and proceeded across the parking lot. He went around to the front of the Hardin automobile and stood there for a few moments.

In the meantime, Verlin Colter arrived and parked. He observed that a darkcolored semi with an empty, yellow flat-bed trailer was parked at the end of the automobile parking lot and that a man was standing in front of the blue Dodge, whose occupants were all apparently asleep.

Dessie testified that the man walked around to the driver's side of the Hardin automobile. She heard a loud noise and then the man ran to the passenger side of the car. Verlin testified that, just as he lay down in his automobile, he heard a loud noise that sounded like a firecracker. He looked up and saw a woman in the front passenger seat of the Dodge opening the passenger door. The man he had seen earlier ran around the car to her door. Beverly Culver, who had been asleep in the back seat of the Dodge with Katie's two older children, testified that she was awakened by a loud noise. She saw a man standing outside the car, next to David Hardin, who lay in the driver's seat with his head resting on the back of the seat, next to the door. The man hurried to the passenger side of the car.

Beverly, Verlin and Dessie all observed what happened next: As Katie Hardin tried to get out of the car, the man grabbed her and demanded that she go with him. She refused, and screamed for David, who lay fatally wounded in the driver's seat. The man shot Katie in the head. He then reached into the car and placed some-

thing into the waist-band of his pants. He ran to his truck and drove off, headed north.

Verlin called the police, who arrived at the rest area just before 5:30 a.m. Based on information obtained from the witnesses, a lookout was posted for a white male, proceeding north on Interstate 75, driving a dark-blue or black truck pulling an empty, yellow flat-bed trailer.

A truck fitting this description was spotted by police just south of Cordele and followed to a rest area in Dooly County. The truck parked in the exit lane of the rest area and the driver went to the restroom. Backup units arrived and the driver, William Howard Putman, was arrested after he returned to his truck. Officers smelled alcohol on Putman's breath and he was initially taken to the Dooly County Sheriff's Office for an intoximeter test, which indicated that Putman's blood alcohol level was .13 grams/percent. Putman had what appeared to be blood on his left pants leg.

Officers recovered a .38 caliber revolver from under the driver's seat of Putman's truck. The revolver had three live rounds and two spent cartridges in its chamber. A gun case and David Hardin's wallet lay on the passenger seat.

Putman was returned to Cook County at approximately 7:30 a.m. Dessie Harris was at the courthouse, having just given a statement to investigators. As she stood outside smoking a cigarette, Putman arrived in a police car. She immediately recognized him as the man who had shot David and Katie Hardin.

At approximately 2:30 p.m. of the same day, the body of William Gerald Hodges was found slumped over the wheel of his automobile in the parking lot of a truck stop in Valdosta. He had been shot in the head and shoulder. The pathologist who conducted the autopsy testified that a time of death could not be established with any certainty. However, lividity patterns indicated that

death had occurred some time prior to Hodges' arrival at the morgue at 3:10 p.m. A .38 caliber bullet was recovered from the interior of his automobile and another was recovered from inside his skull.

After Putman's arrival in Cook County, his clothing was removed from him and the contents of his pockets were inventoried. In his shirt pockets were two .38 caliber cartridges and an insurance card bearing the name William G. Hodges. In the pockets of his trousers were a gold Timex wristwatch and two gold rings, one having a red stone and the other a blue stone. The rings and the watch were identified by friends as having belonged to William Hodges. Serological examination of the reddish-brown substance on the leg of Putman's trousers and on the blue-stone ring established that the substance was blood having characteristics consistent with the blood of William Hodges and inconsistent with the blood of 98.3 percent of the general population. A fresh dent was discovered on the right rear corner of the roof of Hodges' automobile. The dent was horizontal, two or three inches long. Yellow paint was present in the grooves of the dent, and loose flakes of yellow paint surrounded the dent. The yellow paint was the same color as the trailer of Putman's truck.

The .38 caliber revolver found in Putman's truck was purchased by him at a Talledega, Alabama, pawn shop on May 9, 1980. Ballistics examination showed that the bullet removed from the skull of David Hardin, the bullet removed from the skull of Katie Hardin, the bullet removed from the skull of William Hodges and the bullet removed from the interior of Hodges' automobile had all been fired from the same gun: Putman's .38 caliber revolver.

Putman testified that he was returning from Florida on the 9th and 10th of July. He admitted that he stopped at the truck stop in Valdosta at

approximately 10:00 p.m. on the 9th. He said he had two beers and three mixed drinks, and then went to sleep in his truck. When he left a couple of hours later, he took with him a hitchhiker known to him only as "Jeff." He stopped briefly at the first rest area north of Valdosta on Interstate 75, near Hahira, to wash his hands, and subsequently let Jeff out at an exit near Adel. He then proceeded directly to the rest area in Dooly County where he was arrested. Putman denied having stopped at the Lenox rest area. He admitted owning the .38 revolver found in his truck, but denied having shot anyone with it.

*Putman v. State,* 251 Ga. 605, 605–07, 308 S.E.2d 145, 145–48 (1983).

### III. Exhaustion of State Remedies

 Generally, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state court remedies. 28 U.S.C. § 2254(b)(1)(A). "Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" *Snowden v. Singletary,* 135 F.3d 732 (11th Cir.1998) (quoting *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995)). Normally, any petition for federal relief that includes claims not presented to the state court for review (a mixed petition) must be dismissed without prejudice, "allowing either resubmission of only exhausted claims or total exhaustion." *Snowden,* 135 F.3d at 736 (citing *Rose v. Lundy,* 455 U.S. 509, 519–20, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)). However, when it is clear that the unexhausted claims would be barred in state court due to a state-law procedural default, federal courts "can forego the needless 'judicial ping-pong' and treat those claims now barred by state law as no basis for federal habeas relief." 135 F.3d at 736 (citing *Coleman v. Thompson,* 501 U.S. 722, 735

n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). This is because when a Petitioner is barred from raising a federal constitutional claim in state court because of his failure to follow state procedural rules, he is also barred from raising the claim in his federal habeas petition absent a showing of cause for, and actual prejudice from, the procedural default. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558 (1982).

### A. Cause

 While there is no exhaustive list of circumstances to justify a finding of cause, the Supreme Court has made clear that such a finding must ordinarily turn on whether the petitioner can show that some objective factor external to the defense impeded counsel's efforts to comply with the procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In other words, cause requires a showing of some external impediment preventing counsel from constructing or raising the claim. *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). This external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented the petitioner from raising the claim. *Murray,* 477 U.S. at 488, 106 S.Ct. 2639.

### B. Prejudice

 A finding of prejudice is likewise dependent on the particular facts of the case, but a petitioner must show that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). A petitioner must show both cause and prejudice to prevail; therefore a finding by the court that one prong has not been met alleviates the need to analyze the claim under the other prong. *See Frady,* 456 U.S. at 167–75, 102 S.Ct. 1584.

## C. Fundamental Miscarriage of Justice

Absent a showing of cause and prejudice, this Court may consider procedurally defaulted claims only if a failure to do so would result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A fundamental miscarriage of justice has occurred when it is found that a constitutional violation has probably resulted in the conviction of someone actually innocent. *Murray,* 477 U.S. at 496, 106 S.Ct. 2639. With these standards in mind, this Court considers whether certain claims have been procedurally defaulted.

Respondent contends that the following claims in this petition are being raised for the first time and are therefore procedurally defaulted: 1, 2, 14(b), 18, 25, 39 and 40.

**Claim 1: Whether or not there was adduced during the trial of this case sufficient evidence to support the jury's verdict of guilty—**

■ This issue was never raised in Petitioner's direct appeal brief. Although Petitioner did contend on appeal that it was error for the trial court to overrule his motion for new trial on the grounds of insufficient evidence, the two contentions are not the same. Moreover, the new trial motion is raised elsewhere in this petition, which shows that the motion in question was not intended to be the same as the new trial motion raised in the appeal. The Court finds that this claim is and would be found procedurally defaulted by the state court under O.C.G.A. § 9–14–51.

**Claim 2: Whether or not the trial judge's late charge to the jury, which he gave without any request from the jury for recharge, and which he gave after the jury had been deliberating for a number of hours, constituted an impermissible judicial opinion—**

This claim was not raised on appeal or in any of the state habeas petitions and is therefore procedurally defaulted.

**Claims under 14(b) [1]: Petitioner was deprived of effective assistance of counsel at trial because counsel: (1) did not challenge the reliability of testimony from witnesses Culver, Colter or Harris; (2) gave infirm opening and closing guilt/innocence phase arguments; (3) failed to produce evidence about a white van, and; (4) was precluded from rendering effective assistance because of her inexperience—**

The Court agrees that all but the first of these issues are procedurally defaulted because they were not raised on appeal or in any state habeas petition. As for the claim regarding failure to challenge the reliability of testimony by certain witnesses, the Court finds it was raised by Petitioner in the first amendment to his Butts County Habeas Corpus Petition. As such, it is considered under the proper standard of review and discussed in the appropriate section of this opinion.

**Claim 18: Whether the State failed to produce all witness statements made to any member of their investigation and prosecution team—**

■ The Court finds this issue procedurally defaulted. Additionally, the Court notes the incomplete nature of this claim. There is no mention of what statements are at issue, who made them or to whom they were made. As such, the Court finds it insufficient as stated.

**Claim 25: Whether the extensive pattern of state misconduct mandates reversal—**

This general claim appears to touch on several other prosecutorial misconduct-type charges that Petitioner has properly raised. However, this particular allegation has never been raised previously as a separate claim. To the extent Petitioner can arguably be said to have given the state

1. These claims were listed under 14(b) in the original petition but were consolidated, along with claim 36, under claim 14 of Petitioner's amended petition.

courts notice of and an opportunity to address this claim by virtue of any similar claims, the Court notes that the consideration and discussion of those claims is found in later portions of this opinion. This claim is therefore dismissed.

**Claims 6 and 39 (which are identical): Whether Petitioner's Fourteenth Amendment Due Process rights were violated by the trial court's refusal to grant a continuance of trial following the death of the father of one of his attorneys, thereby depriving Petitioner the assistance of that attorney at trial—**

█ The Court finds this claim was raised in Petitioner's initial petition filed in Butts County Superior Court on September 18, 1984. However, it was not raised or incorporated in the amendment to his initial petition, which was filed October 16, 1984. The claim is therefore defaulted.

█ However, even giving Petitioner the benefit of the doubt and considering the claim, the Court finds no constitutional error. "The matter of continuance is traditionally within the discretion of the trial judge.... There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964) (citations omitted).

[A] habeas petitioner who claims that the state trial court's refusal to grant a continuance denied him due process of law must demonstrate, first, that the trial court abused its discretion and, second, that its action rendered the petitioner's trial fundamentally unfair. In determining whether the trial court abused its discretion, we look at the record before the court when it made its decision and ask whether it should have concluded that the denial of a continuance would probably deprive the petitioner of a fair trial. In determining

whether the court's action rendered the petitioner's trial fundamentally unfair, we look for actual prejudice to the petitioner.

*Conner v. Bowen,* 842 F.2d 279 (11th Cir. 1988) (citations omitted).

█ Elsie Griner was retained by Petitioner as his counsel approximately one week after the murders, which occurred on July 10, 1980. She represented him at both the Lowndes and Cook County trials. A lawyer with over sixty years experience, she had tried innumerable criminal cases, including one death penalty case. She was assisted on the Lowndes County case by Marcus Davis of Atlanta and Michael Bennett of Valdosta. On its own initiative, Cook County Superior Court Judge W.D. (Jack) Knight appointed Daniel Studstill to assist Ms. Griner with the Cook County case. At the appointment hearing, the Court explained to Ms. Griner that

I want Mr. Studstill to become just as familiar, and I want Mr. Davis to do so also in order that when this trial is set if for any reason Mr. Studstill is sick, or you are sick, or Mr. Davis is sick or anybody is sick, then those attorneys who are left can go forward and try this case. Now I am also instructing you Ms. Griner that you are in this case from beginning to end. You accepted employment and if ah—that means that you are to continue representing this defendant through all appeals until the case has finally been determined in all the Courts.

(April, 22, 1981, hearing transcript, pp. 5–6).

Mr. Davis was subsequently allowed to withdraw from the Cook County case on May 28, 1981. At the June 17, 1981, pretrial hearing, Ms. Griner successfully requested a continuance in order to obtain the transcript from the Lowndes County trial. The next pretrial hearing was May 24, 1982, some eleven months later. At this point, Ms. Griner was also being assisted by her granddaughter, Galen P. Al-

derman, who had become her partner after graduating from law school in June of 1981. Ms. Alderman had also assisted at the Lowndes County trial while she was a law student. At the hearing, counsel requested and was granted a trial date after June 21st in order to investigate out-of-state witnesses. Trial was set for September 13, 1982, over two years from the date the murders occurred.

On Sunday, September 12, Mr. Studstill's father passed away. An emergency hearing was convened that afternoon to consider a request for a continuance. Ms. Griner confirmed to the Court that she was lead counsel for Petitioner and had represented him continuously in Lowndes and Cook Counties for over two years; that she and Ms. Alderman were retained in the case and that Mr. Studstill had been appointed to provide special assistance, and; that she had planned to let Mr. Studstill conduct the voir dire and handle the examination of some witnesses, although it had not been decided which witnesses he would handle. In moving for a continuance, she expressed her opinion that Mr. Studstill's assistance at trial was necessary. The Court noted that it had appointed two days earlier the Cook County public defender to provide research assistance during the trial. The Court denied the continuance, finding Ms. Griner and Ms. Alderman more than capable of trying the case.

The state court did not abuse its discretion in deciding to proceed with the trial in the absence of Mr. Studstill. The facts show that Ms. Griner was more than quali-fied, with over sixty years experience; was retained as lead counsel by Petitioner; was told by the Court at the time of Mr. Studstill's appointment to be prepared to proceed to trial without him in the event of unforeseen circumstances; had assistance from her granddaughter, who was also retained, as well as the public defender's office; and had continuously represented Petitioner since the time of his arrest over two years before, having filed, briefed and argued numerous motions on his behalf and having acted as lead counsel in his Lowndes County trial. The case had been pending for over two years. At trial, Ms. Alderman (presumably at the direction of Ms. Griner) ultimately conducted most of the examination and made most of the arguments at trial. However, Ms. Griner was present throughout the trial, able to offer instruction and advice and to generally oversee the proceedings.[2]

Even in light of the pretrial delays, this Court is surprised that Judge Knight would order the trial to proceed without the assistance of court appointed counsel. It is hard to see why a day or two would have been harmful. But this Court will not now second guess that decision which was peculiarly within the province of the trial judge, particularly since the defendant received effective representation from his chosen, retained counsel. The Court is equally surprised that Mr. Studstill, even under the personal stress of the loss of his father, would not find it his professional though admittedly difficult duty to participate in the trial.

**2.** The thrust of Petitioner's paradoxical argument seems to be that both Ms. Alderman and Ms. Griner were not competent enough to represent him—the former because she was too young and inexperienced, the latter because she was too old and frail. Aside from pointing to specific instances of ineffectiveness through the issues raised throughout his brief, Petitioner seemingly asks the Court to simply take judicial notice of the fact that no one shortly out of law school or eighty-plus years of age could be competent to conduct a death penalty case. There is no merit to this argument. While inexperience or senility may potentially disqualify an attorney or ultimately render their representation constitutionally ineffective, such ineffectiveness must manifest itself in their actions during the course of representation. Nothing in the record suggests that Ms. Griner was senile or physically unable to provide effective representation, nor is there any suggestion that the representation provided by Ms. Alderman was compromised by her youth and relative inexperience.

**Claim 40: Whether the death sentence imposed in this case is disproportionate to the life sentence imposed in Lowndes County—**

The Court finds that this claim has never been raised previously and is therefore procedurally defaulted.

The state habeas court also found that certain claims raised in Petitioner's second habeas petition were procedurally defaulted under O.C.G.A. § 9-14-51 because they were not raised in the initial petition and subsequent amendments. Specifically, these claims are as follows:

**Claim 23: Whether arresting officers misrepresented circumstances under which the gun was found.**

**Claim 26: Whether black persons, women, and persons between the ages of 18 and 30 were underrepresented in the pool from which Petitioner's grand and trial juries were selected, in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the Constitution.**

**Claim 27: Whether black persons, women, young adults and poor persons were systematically underrepresented in the selection of the foreperson of the grand jury which indicted Petitioner, in violation of his rights under the Sixth, Eighth and Fourteen Amendments of the Constitution.**

**Claim 28: Whether Petitioner was denied his constitutional right to a fair trial when the prosecution asserted that Petitioner presented a danger to witnesses testifying against him.**

**Claim 29: Whether the trial court erred in admitting a photograph of Petitioner in prison clothing, in violation of his constitutional rights.**

**Claim 30: Whether improper arguments by the district attorney during the closing argument rendered the trial and sentencing fundamentally unfair, in violation of Petitioner's constitutional rights.**

**Claim 31: Whether the trial court's guilt/innocence charge to the jury violated Petitioner's rights to due process and to a fair trial before an impartial jury.**

**Claim 32: Whether the verdict returned by the trial jury, which did not specify whether Petitioner was found guilty of malice or felony murder, violated his constitutional rights.**

**Claim 33: Whether the trial court's submission to the jury of statutory aggravating circumstances which were factually and legally unsupported by the evidence, and of which Petitioner may have been acquitted, violated Petitioner's constitutional rights to due process, a fair trial before an impartial jury, and a reliable sentencing proceeding.**

**Claim 34: Whether the prosecutor's improper statements to the jury during the sentencing phase closing arguments so infected Petitioner's trial with unfairness that the resulting death sentence was arbitrary, capricious and unreliable, in violation of the Constitution.**

**Claim 35: Whether the trial court's sentencing phase jury instruction was inaccurate and misleading, in violation of the Constitution.**

The Court has carefully reviewed Petitioner's arguments as to each of the procedurally defaulted claims. Petitioner has made no attempt to explain why these claims were not raised in the first state court habeas petition and has therefore failed to show cause. As for the fundamental miscarriage of justice standard, there is nothing in the arguments to suggest actual innocence. These claims are procedurally defaulted and are not subject to review on the merits.

## IV. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254, established a

more deferential standard of review for federal courts when reviewing state prisoner habeas petitions that challenge state court adjudications. Under amended § 2254, standards of review are established for claims decided on the merits and for factual determinations made by the state court. The previously recited facts as found by the Supreme Court of Georgia will therefore be reviewed under the following standard:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

The standard of review for claims decided on the merits under § 2254 is as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

The Court of Appeals for the Eleventh Circuit has recently shed light on when a state court adjudication is contrary to or represents an unreasonable application of clearly established federal law. *Neelley v. Nagle,* 138 F.3d 917 (1998). In defining

when federal law is clearly established, the court directed that district courts considering habeas petitions "should survey the legal landscape at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority; the law is "clearly established" if Supreme Court precedent would have compelled a particular result in the case." *Id.* at 923.

█ After fully surveying the legal landscape to ascertain the "clearly established" federal law, the court directs that district courts determine

> whether the state court adjudication was contrary to the clearly established Supreme Court case law, either because the state court failed to apply the proper Supreme Court precedent, or because the state court reached a different conclusion on substantially similar facts. If the state court's decision is not contrary to the law, the reviewing court must then determine whether the state court unreasonably applied the relevant Supreme Court authority. The state court decision must stand unless it is not debatable among reasonable jurists that the result of which petitioner complains is incorrect.

*Id.* at 924–25.

## V. Analysis of Petitioner's Claims

### A. Claims Challenging Evidentiary Rulings

Of Petitioner's remaining claims, several challenge evidentiary rulings made by the trial court. As the Supreme Court has pointed out, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). A review of these claims and Petitioner's arguments in support shows no violation of the Constitution, laws or treaties of the United States.[3] Therefore, the

---

**3.** In fact, with the exception of Petitioner's argument on claim 8, there is no citation to

Supreme Court precedent supporting any of the allegations. The lone case cited stands

following claims, which were also found to be without merit on direct appeal by the Supreme Court of Georgia, are denied:

> Claim 3: Whether the trial court erred in overruling Petitioner's motion to strike and bar and motion in limine as they dealt with evidence from the Lowndes County trial concerning the death of William Hodges.

> Claim 4: Whether the trial court erred in overruling Petitioner's motion in limine as it dealt with certain photographic evidence.

> Claim 5: Whether the trial court erred in admitting, over objection from Petitioner's counsel, testimony and photographic evidence of an out-of-court experiment done by law enforcement officers.

> Claim 8: Whether it was error for the trial court to allow the former sheriff to remain seated at the district attorney's table during the jury selection process.

> Claim 9: Whether the trial court erred in refusing to give a charge concerning the weight to be given testimony by law enforcement officers.

> Claim 10: Whether it was error for the trial court to exclude testimony concerning Lowndes County victim William Hodges' homosexuality.

> Claim 11: Whether the trial court erred in sentencing Petitioner, after the jury had recommended the death sentence, without offering him or his counsel the opportunity to make a statement.

> Claim 37: Whether photographs of the children of the victims were wrongfully admitted. (This claim is substantially the same as Claim 4).

merely for the unremarkable general proposition that courts in death penalty cases should vigilantly guard the defendant's due process rights to ensure that the decision to impose the ultimate punishment be based on reason, rather than caprice or emotion. *See Gardner v. Florida,* 430 U.S. 349, 97 S.Ct.

**B. Ineffective Assistance of Counsel Claims**

Plaintiff submitted an amendment to his federal habeas petition. It is a rambling, fifty page restatement of claims raised here and elsewhere evidently attempting to demonstrate instances of ineffective assistance of counsel at various stages of the trial and sentencing.

 In order to prevail on a claim of ineffective assistance of counsel, Petitioner must show that the performance of counsel fell below an objective standard of reasonableness, and that the deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffectiveness claims may be disposed of under *Strickland* if they fail to meet either of these two prongs. *See Oats v. Singletary,* 141 F.3d 1018, 1023 (11th Cir.1998). A court reviewing an attorney's work "should always presume strongly that counsel's performance was reasonable and adequate," *Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir.1992), and "should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy." *Devier v. Zant,* 3 F.3d 1445, 1450 (11th Cir.1993). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable . . . ." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Yet even on the rare occasion when counsel's performance under *Strickland* may be found unreasonable, relief is nonetheless unwarranted unless the petitioner proves affirmatively that the unreasonable conduct prejudiced his case. "To establish prejudice, a petitioner proves

1197, 51 L.Ed.2d 393 (1977). Under the AEDPA standard of review, this hardly qualifies as evidence that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

nothing if he alleges only that the unreasonable conduct might have had 'some conceivable effect on the outcome of the proceeding. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Atkins v. Singletary*, 965 F.2d 952 (11th Cir.1992) (*quoting Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052).

 A large number of these claims were found successive under O.C.G.A. § 9–14–51 by the state habeas court in its order dismissing Petitioner's second petition. That court found that the "same factual basis and legal authority were in existence at the time the original petition was filed, and Petitioner has not shown sufficient reasons, or made any showing, as to why these claims could not reasonably have been raised in his original or amended petition." *Putman*, No. 92–v–319 (Butts Sup.Ct. Sept. 23, 1993). A subsequent review of these same claims in this petition provides no ground for disagreement with the decision of the state court. Petitioner has presented no argument showing cause and prejudice for his failure to present them; likewise, he has not shown that a fundamental miscarriage of justice would result from a failure to consider them. The following ineffective assistance of counsel claims are therefore procedurally defaulted:

(1) **Failure to investigate and challenge the composition of the grand and traverse jury pools.**

(2) **Failure to challenge the grand jury foreperson selection process.**

(3) **Failure to object to the admission of a photograph of Petitioner in jail clothes.**

(4) **Failure to object to prosecutorial statements made during the guilt/innocence phase.**

(5) **Failure to object to various charges given by the trial court to the jury.**

(6) **Failure to object to the form of the guilt/innocence phase verdict.**

(7) **Failure to object to the admission of certain aggravating circumstances.**

(8) **Failure to object to the sentencing phase closing argument.**

(9) **Failure to object to sentencing phase jury instructions.**

(10) **Failure to move for a change of venue at the close of voir dire.**

The remaining ineffective assistance claims were all considered on the merits by the state court. To prevail on any of these claims, Petitioner must therefore show the state court decision was contrary to or involved an unreasonable application of clearly established federal law, or that the decision was based on an unreasonable determination of the facts.

(11) **Pretrial Ineffectiveness**

Petitioner contends counsel was ineffective in preparing for trial because they failed to adequately challenge: (1) the reliability of the identification testimony of the three witnesses at the rest area, and (2) the probable cause for Petitioner's arrest, which led to the seizure of physical evidence from his person.

 The Supreme Court has established that "convictions based on eyewitness identification at trial will be set aside on that ground only if the ... procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The state habeas court found that trial counsel, who were present at the Lowndes County trial and heard the testimony given there, could have reasonably determined that Petitioner's identification was not tainted (and therefore decided not to challenge the admissibility of their testimony at the trial in this case).

A review of the trial testimony of all three witnesses supports this conclusion. The testimony was reliable and consistent. Each witness had sufficient opportunity to

view Petitioner at the time of the crime; each witness focused his or her attention on Petitioner; each witness gave a reasonably accurate description of Petitioner; and each witness was positive in his or her identification of Petitioner at trial. Counsel cross-examined each witness about their identification of Petitioner and their testimony in the Lowndes County trial. There was no ineffective assistance in failing to challenge the reliability of these witnesses.

With regard to counsel's failure to adequately challenge the probable cause for Petitioner's arrest, the state court found that counsel presented a motion to suppress the evidence, argued the motion at a hearing, and subsequently prepared a written brief in support of the motion. This Court agrees with the state court's determination that the motion to suppress this evidence was vigorously litigated. There was no ineffective assistance with regard to this claim.

**(12) Ineffectiveness at Trial**

■ (a) Petitioner contends counsel failed to adequately investigate evidence that another individual committed the crime. Specifically, Petitioner alleges counsel should have further investigated whether Katie Back's former landlord, William Croomes, could have been the perpetrator. Shortly after the murders, police interviewed the children of Ms. Back. Her six year old son Brad, who was awake and sitting in the back seat of the automobile at the time of the shootings, told the police that the person who shot his mother was a man named William who had been a landlord of his family in Kentucky and had repeatedly sought unsuccessfully to date his mother. Petitioner contends that despite this knowledge, counsel took no steps to learn of the whereabouts of this individual (William Croomes) at the time of the crime, nor did they take any steps to interview Brad or produce him at trial.

A proper investigation "has been held to include 'an independent examination of the

facts, circumstances, pleadings and laws involved.'" *Mulligan v. Kemp,* 771 F.2d 1436, 1442 (11th Cir.1985) (citing *Rummel v. Estelle,* 590.F.2d 103, 104 (5th Cir.1979)) (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948)). The hearing transcript indicates that "hundreds of hours of investigation" were spent collecting facts. The trial transcript shows that counsel brought out on cross-examination the fact that Brad and his grandfather, Robert Hilliard, who testified at trial, initially thought former landlord William Croomes was the person who committed the crimes. (Trial transcript 384–391, 600, 609–610). Mr. Hilliard explained that Petitioner and Croomes looked very similar, which was why his grandson and, subsequently, Mr. Hilliard himself (at least in part because of his grandson's description) initially confused Petitioner with Croomes. On examination by the State, Mr. Hilliard testified that any incident with Croomes and his daughter had occurred 2½ to 3 years before her murder. He denied identifying to the investigators Croomes as the possible perpetrator, explaining that he told them only that Croomes looked like Petitioner. Counsel then made an offer of proof through G.B.I. agent Greeson and presented a copy of the statement Hilliard had given. The jury then heard that Brad Back was in the car and thought that a man named William committed the murder. Agent Greeson testified to this statement as well. Counsel solicited from Agent Greeson that the G.B.I. never searched for any suspect other than Petitioner.

The Court is satisfied that counsel took sufficient steps to create whatever reasonable doubt can be said to have existed regarding whether Petitioner or William Croomes was the perpetrator. Petitioner has submitted no evidence to suggest that Croomes may have actually committed the murder. This claim is without merit.

■ (b) Petitioner contends counsel was ineffective for failing to challenge whether the blood found on Petitioner's pants was his own or that of the Lowndes County victim, as the state established. Ms. Griner testified that there was no need for an expert to challenge this determination because Petitioner was clearly aware of his own blood type, which was different than the type found on his pants. There is no error in counsel making a deliberate tactical decision that no expert on this matter was necessary, especially since she knew the test results would be adverse to her client.

(c) Petitioner urges error in counsel's failure to object to the prosecution's comments on his post-arrest silence. This merits of this claim are discussed in detail later in this opinion under Claim 15. Put succinctly, the Court finds the comments were made by a witness and were unsolicited and unforeseeable by the prosecution. There is no error in counsel's failure to object to this testimony.

### (13) Ineffectiveness at Sentencing

■ Petitioner's final argument relates to counsel's supposed ineffectiveness in failing to present mitigating evidence at sentencing. Petitioner attacks counsel's preparation for sentencing at every step. He contends counsel erred by failing to subpoena or interview mitigation witnesses in advance of trial; refusing to develop a mitigation case by placing unreasonable reliance on a belief that Petitioner would be acquitted at trial; failing to request a continuance to prepare for sentencing; and, failing to call anyone from a list of dozens of neighbors, friends and. relatives who swore by post-trial affidavit that they would have willingly testified on Petitioner's behalf at sentencing. Petitioner contends the combination of these shortcomings resulted in assistance so ineffective as to undermine confidence in the outcome of the sentence he received. He attempts to buttress this conclusion by comparing his sentence in this case to the one he received in the related case in Lowndes County.

At the Lowndes County trial in May 1981, Petitioner was represented by three attorneys, including Ms. Griner. After the defense presented the testimony of several friends and family members at sentencing, the jury returned with a sentence of life imprisonment. At sentencing in the present case, defense counsel presented three witnesses in mitigation: Petitioner's sister, his niece, and G.B.I. agent Harold Greeson. Petitioner subsequently received the death penalty.

This Court has reviewed the sentencing phase portion of the trial transcript, as well as the transcript from the state court hearing where all three defense attorneys testified about their preparation for and respective roles in the sentencing phase of the trial. It is the opinion of the Court that counsel was not ineffective with regard to sentencing. The Court finds no significance in the fact that Petitioner received a life sentence in Lowndes County.

That case was tried before a separate jury in another county on its own facts. The majority of the evidence at that trial was discovered during the investigation of the murders in this case. After Petitioner was arrested on suspicion of killing David Hardin and Katie Back, the liability insurance card of Lowndes County victim Hodges was found in his shirt pocket. He also had in his pants pocket jewelry later identified as belonging to Hodges. In his suit pocket were two spent cartridges later identified by ballistics experts as having contained the rounds recovered from Hodges' skull. Based on this evidence, Petitioner was convicted of Hodges' murder. There were no real eyewitnesses at that trial and no real account of the killing.

By contrast, the details from the murders in this case were heinous. Both victims were approached while sleeping and shot in the head. Ms. Back was holding her infant child at the time she was murdered. There were several witnesses, including the victims' other two young children and teenage niece, who were in the

back seat of the car. The aggravating circumstances of this case easily justify imposition of the death penalty.

Petitioner's situation is very similar to that of the petitioner in *Atkins v. Singletary*, 965 F.2d 952 (11th Cir.1992). After reviewing the penalty phase of the trial, the Court in *Atkins* found that virtually all of the mitigating evidence the petitioner argued should have been presented was presented. The Court found that while the petitioner offered "some new evidence that *might* have been presented, '[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.'" *Id.* at 960 (quoting *Foster v. Dugger*, 823 F.2d 402, 406 (11th Cir.1987)).

The same is true in this case. At the state habeas hearings, Petitioner introduced affidavits of dozens of friends and relatives who stated they would have testified at sentencing about his character, family history, personal background and work history. Yet this was all testified to by his sister, niece and Agent Greeson. The sister and niece testified as to Petitioner's good character, background and family life. Agent Greeson testified about Petitioner's favorable work record, as did Petitioner himself. Counsel specifically declined to call Petitioner's ex-wife[4], Sara Putman (whom they had sequestered), because they felt she was too upset and would do more harm than good. (Hearing transcript, pg. 168). Ms. Griner also testified that the daughter told her she was "too angry to testify" that day at trial. The hearing transcript indicates that counsel made attempts to secure other witnesses as well, albeit unsuccessfully. Ms. Griner stated that one witness who testified at the Lowndes County trial and offered to do so at the Cook County trial did not show up because he could not get off work, unbeknownst to her until trial. In addition, Ms. Griner testified that she attempted to locate a co-worker Petitioner had told her about, but was unable to do so because he had moved. Finally, Ms. Griner testified that she and co-counsel had discussed both prior to and during trial how to proceed at sentencing, with the final decisions being made while the jury deliberated.

While the Court agrees that a more thorough sentencing phase presentation probably could have been made, the lawyers in this case

> did enough. A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance. Trial counsel's presentation of mitigating evidence—both what was put in and what was left out—in no way undermined the proper functioning of the adversarial process and, therefore, was constitutionally effective.

*Atkins*, 965 F.2d at 960–61.

## C. Remaining Claims

**Claim 7: Whether the trial court erred in overruling Petitioner's Motion for a new trial on the grounds of insufficient evidence.**

In review of claims challenging the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner was convicted of malice murder, which is defined under Georgia law as when a person "unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. § 16-5-1(a). The voluminous evidence in support of this conviction includes testimony from multiple eyewitnesses to the crime, recovery of David Hardin's wallet from the passenger seat of

---

4. The divorce occurred between the Lowndes and Cook County trials.

Petitioner's truck, recovery of a .38 caliber revolver containing two spent cartridges and three live rounds from under the driver's seat of Petitioner's truck, and establishment by way of ballistics examination that the bullets removed from the skulls of both David Hardin and Katie Back were fired from this revolver. This Court agrees with the conclusion reached by the Supreme Court of Georgia: the evidence in this case is not insufficient, it is overwhelming.

**Claim 12: Whether the trial court erred in failing to overrule Petitioner's motion to strike and quash the Georgia statute providing for the death qualification and voir dire question.**

**Claim 13: Whether the trial erred in denying Petitioner's constitutional challenge to the Georgia Death Penalty Statute.**

Both Petitioner's claims challenging Georgia Death Penalty Statutes have been decided against him in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (which held that the "death qualification" of jurors does not violate any constitutional right) and *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (which held that Georgia's death penalty statute does not violate the Eighth or Fourteenth Amendments). Therefore, these grounds provide no basis for relief.

**Claim 15: Whether counsel committed constitutional error by failing to seek an instruction during the penalty phase of trial informing the jury that, if it chose to impose life sentences on each of the murder counts, it could further order that the sentences be served consecutively.**

█ Although Petitioner lists this as his claim in the heading, the actual body of argument under this heading discusses an alleged improper reference to Petitioner's exercise of his *Miranda* rights. Nonetheless, there is no merit to the bald assertion of ineffective assistance because of failure to seek an instruction regarding consecutive life sentences. This issue has been decided adversely to Petitioner by the Supreme Court of Georgia. *Spivey v. State*, 253 Ga. 187, 192, 319 S.E.2d 420, 428 (1984).

█ The actual argument under Claim 15 centers around testimony by one of the arresting officers, W.D. Sumner. On direct examination by the prosecutor about the circumstances of the arrest, the following dialogue took place:

Q: State any other physical conditions you observed.

A: You could smell alcoholic beverages on him, yes, sir.

Q: What did you do then, Trooper?

A: At the jail I issued Mr. Putman a citation for driving under the influence and took Mr. Putman back out to Trooper McKinley's car and as we went to put him in Trooper McKinley read him the Miranda Warning. Mr. Putman advised us he understood his rights and that he wanted to talk to a lawyer as soon as possible. Trooper McKinley left with him at that time and was taking him back to—took him to Turner County to meet some units that were coming up there to meet him and pick him up. I went back to the rest area with the truck and I believe the wrecker was there or arrived shortly after I got there.

(Trial transcript at 1053).

Under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), it is clear that a person's post-arrest silence may not be used to impeach him at trial, but that was not done in this case. The prosecutor did not question Petitioner about his post-arrest silence, as was the case in *Doyle*, nor did he solicit testimony on the matter from officer Sumner. Rather, the officer mentioned Petitioner's silence only in the midst of his narrative description of the events following Petitioner's apprehension. This inadvertent reference does not rise to

the level of a constitutional violation as envisioned under *Doyle*. Claim 38, which is a restatement of this claim, is also denied.

### Claim 16: Whether the trial court erred in failing to exclude identification testimony as unreliable.

 Petitioner challenges the admission of identification testimony from witnesses Culver, Harris and Colter. When determining the admissibility of eyewitness testimony, the primary evil to be avoided is a very substantial likelihood of misidentification. "It is the likelihood of misidentification which violates a defendant's right to due process...." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The Court in *Neil* made clear that, even in cases where the confrontation procedure may have been suggested, the central question is whether, under the totality of the circumstances, the identification was reliable.

> Factors to be considered include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. 375.

 The Court has reviewed all portions of the trial transcript relating the testimony of these witnesses. All three of the witnesses testified to having viewed Petitioner at close range at the time of the murders when their level of attention was high because they were startled by the sound of gunshots. While it is true that over two years elapsed between the time of the murders and the testimony of these witnesses at trial (due in large part to continuances granted at the request of counsel for Petitioner), the Court is convinced there was no substantial likelihood of misidentification of Petitioner by any of these witnesses. This claim is denied.

### Claim 17: Whether O.C.G.A. § 17–10–36 (Unified Appeal Procedure) denied Petitioner his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Petitioner contends that the Georgia Unified Appeal Procedure (UAP) is unconstitutional because it upsets the balance of power between the state and the accused in an adversary system; violates a defendant's right to silence; violates equal protection because it only applies in capital cases; and violates the right to counsel by (a) asking counsel to identify which issues will or will not be raised, which allegedly discloses trial strategy, (b) asking defendant during the course of trial whether he is satisfied with counsel, without providing independent counsel to assist him in making this judgment, and (c) thrusting the court directly into the attorney-client relationship. These same challenges have been denied by the Supreme Court of Georgia, which found the UAP to be constitutional in *Sliger v. State*, 248 Ga. 316, 282 S.E.2d 291 (1981). Petitioner has presented no authority to the contrary in support of his arguments. Having reviewed *Sliger* and the UAP, the Court finds no merit to these claims.

### Claims 19–24: Whether the state failed to reveal exculpatory material evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court has since held that favorable evidence is material and should always be disclosed, regardless of whether it is requested. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Constitutional error results from the suppression of such evidence

if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Thus, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . *Bagley* materiality is not a sufficiency of the evidence test. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Finally, the determination of whether due process has been violated is made by considering the cumulative effect of all the suppressed evidence favorable to the defense, as opposed to considering the evidence on an item-by-item basis. *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. With the exception of Claim 23, (which deals with the circumstances under which the gun was found in Petitioner's truck and was found successive by the second state habeas court because it was known to Petitioner but was not raised in his first petition) Petitioner's *Brady* claims were all considered under this standard by the state habeas court and found to lack merit. (July 6, 1994 Butts Sup.Ct. Order, pp. 2–8). Therefore, this Court will briefly describe each claim and then consider whether the state court's decision involved an unreasonable application of clearly established law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.

**Claim 19: Whether the state withheld evidence that three witnesses saw a blond man commit the Lowndes County murder.**

Since his first habeas hearing, Petitioner has discovered a memo in the Cook County Sheriff's Office investigative file. The note was made by Joe Futch, a Cook County Deputy Sheriff who investigated the case. Mr. Futch testified that he recognized this portion of the memo: "7/14/80, Debra Pierce atty., Dothan AL, 205–588–3671; blond man knock on door and ask—I don't know what that stands for—three people from Mid Continent Inn saw blond shoot guy in big car." (Hearing transcript, pg. 159). He then testified that the portion of the memo he found difficult to read appeared to say "blond man knock on door and ask if going north." (Hearing transcript, pg. 165). Mr. Futch's testimony shows that he took down this information from a caller who had apparently been given the information by the three people from the Mid Continent Inn. He testified that the Mid Continent Inn was located in Valdosta in Lowndes County, the site of the Hodges murder. He also testified that he understood the caller to say that she was going to be representing Petitioner. Suspecting that he was talking to someone from the media who was just trying to find out what the police knew, he told the caller to come forward with the information.

At some point not long after this conversation, Mr. Futch told GBI Special Agent Harold Greeson about the call. Although Greeson denies he ever understood Futch to say he had received a call about possible evidence of witnesses who saw someone other than Petitioner commit the Hodges murder, he did testify that handwriting in the upper right-hand portion of the memo appeared to be his. This portion of the memo read "Mrs. James Enfinger, Hartford, Alabama." (Hearing transcript, pg. 203). GTE Telephone Company records confirm that the number written by Futch on the memo has been listed to a James Enfinger of Hartford, Alabama since 1964.

Part of Petitioner's testimony at trial was that a blond man had approached him in the Truck Stop of America parking lot in Valdosta and asked for a ride north.

Petitioner's testimony and theory of the case was that this man had an opportunity to acquire his gun from the cab of his truck and kill all three of the victims. As such, he alleges constitutional error by the prosecution for failure to produce the memo. Petitioner reasons that had the memo been available, there is an excellent chance defense counsel could have located Debra Pierce and then the three witnesses from the Mid Continent Inn.

Both Futch and Greeson testified at trial in rebuttal and again at the state habeas hearing. In sorting out the significance of this memo and the testimony of Futch and Greeson, the habeas court made the following finding:

It is clear from the testimony that shortly after the murders, someone called the Cook County Sheriff's Department, talked with investigator Futch, told Futch she was an attorney who would be representing Putman, and gave him some hearsay information about the Lowndes County murder. The Cook County Sheriff's Department was receiving many media calls at that time. Futch advised the caller to come forward with the information but did not hear from her again. The telephone number was and is that of the Emfingers. It appears to the Court that someone possibly called the number and learned it was a deadend.

Petitioner further alleges that the officers gave untruthful testimony regarding having heard anything regarding a blond hitchhiker. Petitioner has mischaracterized the trial testimony. The officers were asked at trial whether Petitioner, directly or indirectly, had communication to the witness of any other person, information regarding an individual in his company on the nights of July 9 and 10, 1980.

The Court finds no evidence that the prosecution possessed exculpatory evidence or that Agent Greeson and Investigator Futch gave false testimony. The Court further finds that even if the note

had been produced to the Petitioner, there is no reasonable probability the outcome would have been different, thus Petitioner failed to meet the showing required . . . .

(July 6, 1994 Butts Sup.Ct. Order, pp. 3–4).

This Court agrees with the determination of the state court. To find for Petitioner, the Court must conclude that defense counsel would have been able to locate Debra Pierce (despite the inability of Greeson or Futch to find her after reaching a dead end with the Enfinger phone number); confirm that three witnesses did see a blond man commit the Lowndes County murder; locate the witnesses to verify their accounts; and present the evidence to the Cook County jury and persuade them an inference should be drawn that this same unknown assailant was responsible for the Cook County murders. In order to persuade the jury in this case, counsel would have had to convince them: (a) that this unknown blond man left the Lowndes County murder site, drove up the interstate and killed two more victims with Petitioner's gun and then somehow placed the gun back in Petitioner's truck; (b) that all three witnesses to the Cook County murders were either lying or mistaken; and (c) that all the forensic evidence (e.g., blood stains on Petitioner's clothing) was erroneous or planted. This chain of remote possibilities is simply too speculative to equal a reasonable probability of a different outcome, as is required under *Brady*.

**Claim 20: Whether the state withheld evidence that Dessie Harris, an eyewitness in the case, was completely unreliable as an eyewitness.**

 Petitioner contends the state failed to disclose that the eyewitness identification testimony of Dessie Harris was completely unreliable. Petitioner introduced at the habeas hearing an affidavit from Ms. Harris in which she testified that the man she saw commit the murders at the rest stop was in Michigan and had been following her:

When I was living in Michigan, I saw the same man I had seen at the rest stop. I saw this man following me numerous times. I called Mr. Greeson repeatedly to tell him the man from the rest stop was now in Michigan. Each time, Mr. Greeson told me it was not true, because Mr. Greeson knew the man was in jail in Adel. These contacts with Mr. Greeson happened before the trial.

(Hearing transcript, pg. 240; *Appendix 5, Affidavit of Dessie Harris Myers*).

During the October 1993 habeas hearing, Agent Greeson testified that he did not talk with Ms. Harris from July 1980 when he initially interviewed her until the day before the Cook County trial in September 1982. Between the time Ms. Harris left Georgia on July 10, 1980, and Petitioner's trial in September 1982, she lived in Kentucky, Texas, Florida and Michigan. She admits that during that period she was extremely unstable, drank heavily, had blackouts, had the DT's, broke a window and destroyed furniture in her mother's home, and had a complete nervous breakdown and tried to commit suicide. Based on Ms. Harris' instability and Agent Greeson's testimony that he had not spoken to her, the Superior Court concluded that Petitioner had not proven by a preponderance of the evidence that the State possessed evidence favorable to the defense (i.e., that Ms. Harris contacted Mr. Greeson with information about being followed by the alleged killer). The Court finds no error in that determination.

**Claim 21: Whether the state failed to disclose that eyewitness Beverly Culver heard the killer call her aunt by name.**

▉ Beverly Culver, the niece of David Hardin, was sixteen at the time of trial. She testified on direct examination by the prosecution that the murderer went over to Katie Christine Back (her aunt) and told her if she didn't go with him she knew what was going to happen. He then put the gun next to her head and shot her. Ms. Culver then pointed out Petitioner as the man who shot her aunt. Under later examination by defense counsel, she testified that she had not made a statement to anybody about the case but that she did say something to the police about it in July 1980. This was the extent of the questioning of Ms. Culver on this issue. On August 5, 1993, Ms. Culver signed an affidavit in which she said she specifically recalled "that the man called Christine by her name, 'Christine.' He said something like 'Christine, come with me or you know what will happen.' He spoke to her as if he knew her." (H.T.242). Ms. Culver went on in the affidavit to say that she specifically recalled telling a female police officer what happened, including the fact that the killer called her aunt by name. She also testified that she was never contacted by anyone representing Petitioner until July 1993 and that had they attempted to contact her, she would have been willing to tell them what happened that night.

Petitioner now contends the State failed to disclose material information in violation of *Brady* because GBI Agent Cris Robertson[5] failed to reveal in her trial testimony concerning her interview of Ms. Culver the full details of the interview, i.e., the identification of her aunt by the killer. Petitioner contends this evidence was material because the State conceded there was no evidence that Mr. Putman knew Katie Christine Back; therefore had his counsel been informed that the killer called Ms. Back by name, they could have used the information to show that Mr. Putman was not the killer. The Court disagrees.

First, the Court finds the State did not suppress this evidence. Agent Robertson interviewed the witness and later testified about her summary of the interview. She did not contend, as Petitioner admits, that

5. Agent Harold Greeson confirms that Agent Robertson was the woman officer who interviewed Beverly Culver and prepared a summary of the interview.

her summary reflected every word Ms. Culver may have told her. She testified according to the questions asked by both sides. In addition, Counsel for Petitioner could have obtained the disputed information with any reasonable diligence. Ms. Culver admits in her affidavit she was never contacted by Petitioner's counsel until 1993, but that had they asked her, she would have freely revealed this information from the beginning. For these reasons, the Court finds no merit to this claim.

### Claim 22: Whether the state failed to disclose that the body of Gerald Hodges, the victim in the Lowndes County murder, was discovered in the morning instead of the afternoon.

Petitioner was tried and found guilty of the murder of Gerald Hodges prior to the trial of this case. Certain evidence from the Hodges trial was introduced in the Cook county trial in support of the State's theory that one person killed both the Cook and Lowndes County victims. Petitioner points to differences in the testimony of various officers investigating the Lowndes County murder about when they each heard about the discovery of the body. Agent Greeson, for example, testified that he first heard about the murder about 12 p.m. on July 10, 1980. Lowndes County lieutenant Edward Crow testified he overheard a call to another unit about 2 or 2:30 p.m. that day and responded to the call, finding a Deputy Morgan already on the scene. Morgan in turn testified that he was met at Hodges' car by Raymond Upchurch, the person at the truckstop who had called the sheriff's office. Mr. Upchurch testified that he noticed the car when he came on duty at 7 a.m. and that it had been sitting there all day. Employees from the truckstop told Deputy Morgan they had noticed the car sitting there all day as well. As the Court understands it, Petitioner contends that Hodges and Crow deliberately lied about the time they heard about the discovery of the body in order that they might remove evidence from the body of Hodges and plant it on Petitioner. Petitioner attempts to make this argument in a mind-numbing, tenpage conspiracy theory analysis that amounts to nothing more that the most vague form of speculation. The Court agrees with the state habeas court; this claim is totally without merit.

### Claim 24: Whether the state failed to disclose material portions of the state-ordered psychological evaluation.

 Petitioner was given a state-ordered psychological evaluation the day after his arrest. A summary of that interview, which was conducted by Dr. Loren Hildebrandt, was prepared by someone in the Cook County District Attorney's Office. A copy of this summary was then sent to Petitioner's attorneys. In an affidavit submitted to the state habeas court, Ms. Alderman Mirate testified that the copy received by the defense did not contain the final six lines of the original report, which were eventually found in the file. Those six lines read as follows:

> [T]here is a possibility that the ingestion of drugs and alcohol was such that there could have been a period of blackout when he could not recall what went on during that particular series of events. There is no clinical proof to the fact that he did or did not have a blackout, however, clinically it has been established that blackouts do occur under the influence of drugs and alcohol.

(Hearing transcript, pg. 434).

Ms. Alderman Mirate testified that Mr. Hildebrant's opinion that Petitioner may have been suffering from a drug and alcohol blackout would have been useful to Petitioner's defense and may have resulted in a different defense strategy at both the guilt/innocence and sentencing phases. Based on Ms. Alderman Mirate's testimony, Petitioner contends the prosecutor's failure to turn over the report was a *Brady* violation.

The state habeas court considered several facts from the habeas hearing in de-

**1309**

ciding this claim. First, several members of the district attorney's office testified that the state had an open file policy in Petitioner's case and that defense counsel had inspected the file in the presence of a prosecutor. Second, former District Attorney Vickers Neugent had suggested to Ms. Griner that Petitioner should have a psychological examination, but she was opposed to it. Finally, Petitioner's third attorney, Daniel Studstill, acknowledged when asked about whether he had considered a possible insanity defense that he was aware of Petitioner's condition at the time of the murders.

> When you say insanity defense, I also include within that scope, the defense of intoxication and yes, I knew that Mr. Putnam had talked about taking some— he used some words like Black Beauty, the West Coast Turnaround or something to keep him awake when he was driving and mixing that with alcohol. But I felt that all that was certainly voluntary intoxication and offered no legal defense, no legal justification. So, yes, that entered my mind as part of an insanity type justification type.

(August 27, 1985 Butts Sup.Ct. habeas transcript, pp. 80–81).

Based on this testimony, the court concluded there was no showing "by a preponderance of the evidence that the Petitioner did not possess the evidence nor could [not] obtain it himself with any reasonable diligence, that the prosecution suppressed the [alleged] favorable evidence or that a reasonable probability exists that the outcome of the proceedings would have been different." (July 6, 1994 Butts Sup.Ct. Order, pg. 8).

This Court is troubled by the suspicious circumstances under which the last six lines of this report went missing and were eventually discovered. However, Petition-

er has not shown that the state court decision on the merits was contrary to or involved an unreasonable application of clearly established federal law, nor has he shown that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. A review of the transcript and arguments of counsel shows that there was a box purporting to be the complete district attorney file; the box was left with counsel for Petitioner in the law library; and that no one from either side could state exactly what was in the box, who saw it, or when the review took place. Based on this evidence it seems just as likely that the missing portion of the document was in the file (yet overlooked by Petitioner) as it does that the prosecution suppressed the evidence and later placed it back in the file in an attempted coverup (as Petitioner would have the Court believe). Under these circumstances, this Court cannot say that the state habeas court based its decision on an unreasonable determination of the facts by concluding that Petitioner was unable to show by a preponderance of the evidence that he did not possess the evidence nor could not obtain it with any reasonable diligence, or that the prosecution suppressed the evidence.

▮ The Court also agrees that Petitioner has not shown that a reasonable probability exists that the outcome of the proceedings would have been different had this alleged *Brady* evidence been disclosed to the defense. The state habeas court noted that former District Attorney Vickers Neugent had suggested to Petitioner's lead counsel, Elsie Griner, that a psychiatric examination be performed, but that she declined and responded that such an examination was against her policy and advice.[6]

6. Petitioner argues that this should be given little weight because the suggestion by Mr. Neugent was probably based on Petitioner's alleged suicide attempt. Petitioner contends it was erroneous for the state habeas court to conclude that because Ms. Griner rejected

this advice from a prosecutor (who made his recommendation based on an alleged suicide) that she would have also rejected any suggestion of an exam by co-counsel Ms. Alderman Mirate, based on the unknown conclusion in the missing portion of the report about a

Mr. Studstill testified that he had considered the evidence of Petitioner's intoxication as a possible defense but ultimately rejected that strategy.[7] The Court cannot say that a reasonable probability exists that Petitioner's counsel would have even pursued Petitioner's possible blackout, much less that such evidence would have resulted in a different outcome. There is no indication that counsel ever sought to interview Mr. Hildebrant about his conclusions (after all, the report was only a summary prepared by a third party). Counsel also chose not to hire an expert of their own (based on their reading of the incomplete report and their own knowledge of Petitioner's condition) to explore a possible blackout theory, despite Mr. Studstill's appreciation of the intoxication defense theory.[8] For this Court to conclude that the report would have somehow enabled Ms. Alderman Mirate to convince Mr. Studstill and lead counsel Ms. Griner to explore a blackout defense they had theretofore rejected would be mere speculation. This claim is denied.

### CONCLUSION

After carefully reviewing Petitioner's forty claims (including various sub-parts), briefs of both sides, the orders from all prior state court habeas proceedings, and the order of the Supreme Court of Georgia, the Court finds no grounds on which to grant Petitioner's 28 U.S.C. § 2254 petition. Relief is thereby **DENIED.**

---

possible blackout. While the Court agrees that under some circumstances this may have caused counsel to chart a different course and explore a potential blackout defense or different mitigation strategy, this would not have been likely under the facts of this case, in light of the testimony from both Ms. Griner and Mr. Studstill.

7. While Mr. Studstill did not use the term "blackout," his testimony indicates that he was aware of Petitioner's state of being at the time of the crimes and had sufficient facts to investigate the possibility of a blackout. He chose not to do so.

8. While counsel did hire an expert to evaluate Petitioner prior to the state habeas hearing, this obviously sheds no light on their decision not to do so prior to trial.